23-3130, Allied World Specialty v. Blue Cross and Blue Shield. Good morning, may it please the Court. My name is Kevin Tessier and I represent Blue Cross Blue Shield of Kansas, the appellant in this case. I would like to reserve three minutes of my time for rebuttal. I hate to destroy your rhythm, but I have been dying to ask somebody in this case something. Since there is recognized coverage for defense costs under the E&O policy, why does the, I mean, this must matter, whether the availability to recoup defense costs under the D&O policy is going to be significant at Blue Cross, but why? Why what? Well, because Allied World is already paying defense costs under the E&O policy. Because the defense costs far exceed even the limits of the E&O policy. Thank you. Yes. Okay. Happy to answer that question. So in this particular case, we do have an insurance policy, the D&O policy, that has an express grant of coverage for claims for antitrust activities. And that express grant of coverage includes everything from violations of the Sherman Act, violations of the Clayton Act, claims for price fixing, claims for monopolization, claims for restraint of trade. And Judge Bachrach, as you noted, Blue Cross was sued in what ultimately turned out to be multi-district litigation alleging all of those claims against Blue Cross. And in this particular case, Allied World denied coverage for those lawsuits. Now, the district court held that Allied World correctly denied coverage on two grounds, a managed care activities exclusion, which we'll talk about first, and then two different relatedness provisions in the policy, a related claims provision, and then a prior pending litigation exclusion. So let's start with managed care activities exclusion. The court's analysis has to start with that express grant of coverage. So here we have an entirely separate, standalone insuring agreement in the D&O policy that says Allied World will cover claims for antitrust activities. And it's comprehensive coverage. It's all of those things I listed, violations of the Sherman Act, Clayton Act, price fixing, monopolization, restraint of trade. And here, the managed care activities exclusion that Allied World relied on does not reference that coverage for antitrust activities at all. Instead, the language in that exclusion precludes coverage for claims for alleged acts, errors, or omissions and performance of or failure to perform managed care activities. Now if that language sounds familiar, actual or alleged, actual error or omissions, it's because that language tracks exactly the definition of wrongful acts. And wrongful acts has its own separate insuring agreement and coverage in the D&O policy. So that's already one clue what this exclusion applies to. But as interpreted by the district court, the managed care activities exclusion would preclude coverage for any claims concerning products or services that Blue Cross buys or sells. And that creates an irreconcilable conflict between the express grant of coverage for antitrust activities claims in the policy. So an antitrust claim by its very nature addresses the market in which the business. So you're suggesting it's illusory? No. No. That's not. Our position is at a minimum, that conflict creates an ambiguity. You're not sure how those two things interact because it does seem to eliminate, like how could you have a price fixing claim that doesn't involve what Blue Cross buys or sells? You know, that exclusion to that express grant of coverage to that one particular insuring agreement would nullify that term. So your argument really on ambiguity really isn't ambiguity because it covers antitrust activity. It's really the subsidiary elements like price fixing, monopolization that are expressly incorporated into the antitrust activities insuring agreement. Yes. Absolutely. Yes. So there is a well-established body of case law which, according to those cases themselves, overwhelmingly supports the position that an insurer cannot grant coverage with one hand and a very specific grant of coverage here for antitrust activities and then rely on an exclusion to take that coverage away, especially an exclusion that doesn't even, you know, reference the antitrust activities coverage in the policy. So the district court said, well, there is no irreconcilable conflict between the antitrust activities coverage and this particular exclusion because three claims would still be covered. So the court said first that claims against directors and officers for stealing money from the company would still be covered under the policy. But that doesn't really work for antitrust coverage, does it? Because Allied World doesn't even try to defend that example of what would be a covered claim on appeal. It's not an antitrust claim. Two executives stealing money from the company is not an antitrust claim. And it's also not a claim against Blue Cross Blue Shield of Kansas. And the particular, even though it's in a police officer's policy, this particular kind of policy provides coverage to the corporate entity too. So Blue Cross as a company has coverage for claims alleging antitrust activities. So that example doesn't work at all and it's not one that Allied World defends on appeal. The second example of what would be a covered claim according to the district court is a claim involving the offering of debt or equity. And if all of these examples seem off the wall, like where is the court getting these examples? They come from a case called Benicard that involved an insurance policy that didn't have express antitrust activities coverage. It was a wrongful acts coverage insurance policy at issue and it didn't involve an underlying antitrust claim. So that's already clue one for the court that we're talking about examples that don't really apply here. And once again, that example, the offering of equity or debt, that is another example from the district court opinion that Allied World does not defend on appeal. That isn't an antitrust claim either. At a minimum, it's certainly not one that would be made against Blue Cross Blue Shield of Kansas. It's a managed care company. It's not in the business of offering debt or equity. And so it's axiomatic. You can't be sued for an antitrust violation in a market that you don't compete in or participate in. So this example really is something that would never be brought against Blue Cross in the first place. So the third example, mergers and acquisitions. So Allied World and the district court never explain why that claim, a claim for mergers and acquisitions, somehow would be outside the scope of the managed care activities exclusion. But the principal antitrust concern with mergers and acquisitions, of course, is market power. Market power. So an antitrust claim based on a merger or acquisition necessarily implicates the products and services that Blue Cross buys and sells. And here's the critical point. So if antitrust claims are in fact covered as Allied World concedes, then there is coverage for the underlying lawsuits in our case. Because those lawsuits alleged, among other things, that the rules that the Blue plans set up, the defendant set up, restricted the ability of non-Blue plans to come into the state and to buy that company and compete in the market for health insurance. So there were the alleged violation of antitrust law was a restriction on mergers and acquisitions. Allied World's only response to that argument, one response, is that no, that doesn't apply here because not only does it have to be a merger and acquisition, it has to be an actual merger or acquisition. It can't be a restriction on a merger or acquisition. But Allied World is just making this up. There's no language in the policy that says that's the requirement. So you have a situation if in fact that example is accurate, and that's the one example that Allied World said would be covered, the policyholder wins in this case. So the bottom line by Allied World's own admission, there is only one claim, mergers and acquisitions, that would be covered by an insuring agreement that says Sherman Act violations covered, Clayton Act violations covered, monopolies covered, price fixing covered, restraints of trade covered. It doesn't add up. There's an inherent tension between those two things. And at a minimum, there's an ambiguity in the policy about how those two things interact, that express grant of coverage compared to that exclusion, which doesn't expressly talk about the antitrust coverage. And so you have a couple of key principles, I think, operating in the background here. The first is you have to give meaning to each of the terms in the policy. And Judge Smith talked about the antitrust activities, but one of those is price fixing. And what you won't hear Allied World say to you today, they certainly haven't said it in their briefs, and what the district court didn't say either, what kind of a price fixing case would still be covered under Allied World's interpretation of the policy? There can't be one, because they're interpreting that exclusion to say anything that relates to products or services that Blue Cross buys or sells are excluded. You can't fix prices otherwise. So what this court should hold is that there is an express and irreconcilable conflict between the grant of coverage for antitrust activities and the managed care activities exclusion, and that ambiguity alone should be resolved in favor of coverage in the policy holder, as Kansas law clearly dictates. I would like to switch gears a little bit and talk about the relatedness provisions. So the first part of the policy that the district court relied on to support that grounds for the denial of coverage says if you have a claim in the policy period, it can be related to another claim. But there isn't any language in that provision that says you can take a claim in the policy period and relate back. I know I reserved time, but I'll keep going. But that related claims provision doesn't say you can take a lawsuit filed during the policy period and relate it back to something like the Love lawsuit 10 years earlier in a prior policy period. And we cited cases that say if an insurance policy does that, there's express language that allows it to do that. Why is it implicit when the relatedness provision says it shall be considered a single claim made when the first claim had been made, i.e., in this case, when the Dr. Love claim had been filed? Well, I think that's a good question. You have to keep reading, because what it says when those two claims are considered a related claim and it's at the earlier claim, it goes on to say, and for purposes of that related claim, there's a single retention and a single set of limits under this policy. So right there is your clue that you can't go back. In deciphering the clue, does that mean that there's two separate points in the relatedness provision, or are you assuming that they're all integrated? In other words, it's a limit on the policy under the sentence two, but isn't it also a reasonable reading that also it means that it's a single claim that is being made when the Dr. Love claim is made? Within the policy period, because it's telling you you have to have a single set of limits and a single retention for that claim. It doesn't have the language in the other policies that we cite in the cases that say it doesn't matter if it goes back to a prior policy, that's okay. Our policy at issue in this case doesn't have that. On the prior pending litigation exclusion, again, the district court made a similar error. It relied on the language in the exclusion that applies to claims for wrongful acts, but the key language that would apply to claims under the antitrust activities insuring agreement is alleging or derived from the same or essentially the same facts, and here it's not even close. The antitrust litigation has fundamentally different conduct alleged. It's dividing the country into exclusive service areas, fixing prices through the blue card program, implementing the rules that I talked about that restrict acquisitions and non-blue business where Love, the lawsuit 10 years before the policy period, related to a conspiracy to manipulate claims handling systems, to down code, to bundle claims, and in that RICO case it was the predicate acts were mail and wire fraud, so you have something that's not even close to be considered related under the PPL exclusion. Thank you. I need to ask you a question. I might have misunderstood you earlier, but I thought you said that the language in the exclusion for managed care activities, that that language tracks some coverage language in the policy. Is that right? That's right. What language in the coverage provisions is that? The definition of wrongful acts. So in the managed care activities exclusion precludes coverage for any claim alleging, arising out of, based upon, or attributable to. It's GG3 that it tracks in the definition of wrongful acts. Let me see, I will tell you what the, GG1. Yeah, that whole section there, yes. Okay, thank you. Thank you. Hi, may it please the court, I'm Joseph Lang from Carlton Fields in Tampa for Allied World Specialty Insurance Company. At council table with me is Heidi Rasky, who is also on the brief with me. I hear a lot about what we have admitted or conceded or waived or acquiesced to is to the breadth of this managed care activities exclusion. So I think right out of the box, I want to talk about some things that depending on the allegations in a given complaint, would be not covered by the MCA exclusion. And therefore, it doesn't do as being speculated, take away everything that was given with the left hand, take it away with the right hand. We can talk about agreements, first as an overview as to all of this. There's a difference between running your managed care organization and running the business as a whole vis-a-vis other competitors. And so I think that's a very important distinction that goes into many of these examples I'm about to give. But agreements with competitors not to poach each other's employees, agreements with competitors to fix salaries of the executive employees within the various competitors, or to fix salaries. Those are things that would fall, depending on the allegations in a given complaint, fall outside of the managed care. So you're saying fixing salaries horizontally with other managed care activity organizations? With other competitors that may not even be managed care. Other competitors in the broader insurance market, that there's a difference between running your own managed care organization, which is what these allegations in this lawsuit, the MDL lawsuit are about, and the business's outside world. Okay, so as I understand it, because your adversary is arguing, well the price fixing is one of the components in the insuring agreement for antitrust activities. And what he's saying is well, this entity, Blue Cross Blue Shield of Kansas, they sell managed care activities. And so for price fixing, he says that you can't price fix your sale of managed care activities and be covered if the exclusion is not in the insurance agreement. Exclusion covers all managed care activities. That's all we do. Like if I sell widgets, and I get a liability insurance policy that says you are protected for the sale of widgets, and then there's an exclusion that says, well, there's an exclusion for the sale of widgets. Or let's say I'm protected for price fixing, and there's an exclusion for, well, there's an exclusion for anything involving the sale of widgets. Well, I can't, if you're talking about the sale of the ultimate consumer, there's no scenario I assume that I can actually invoke my insuring agreement for price fixing. But what you're saying is, well, it also covers not only the sale of the ultimate consumer, but price fixing can be horizontal with salaries. Yes, Your Honor. Did you ever argue that? I didn't notice that in your briefing on appeal. Did you argue that? That particular example is not in our brief. We do embrace the statement by the district court and also by the Benicard court, you know, quote, myriad other claims against directors, officers arising from commercial transactions. So anticipating the way this argument might go today, I tried to come up with some more concrete examples. Well, there's, you know, and the judge says, like, Benicard, well, if you ignore the subsidiary elements like price fixing, monopolization that go in, that are specifically incorporated into the insuring agreement for antitrust activity, if you put those aside, yeah, there are certain, hypothetically you argue, antitrust claims like mergers and acquisitions, et cetera, or stealing from employees, they say. But there's nothing that the judge or you in your briefing actually addressed how you can take advantage of this insuring agreement for price fixing, for monopolization, if you're going to exclude anything involving the only product that Blue Cross Blue Shield of Kansas sells that is managed care activities. Well, I think I just gave an example of the poaching of employees, the fixing of salaries. This is at the corporate level dealing with other competitors. Also... But the problem is you're raising this for the first time, you know, in oral argument on appeal. The district judge didn't have the benefit of that, and frankly, we didn't have the benefit of that until you just said it. Okay, but defending the district court's order, the district court points out that this is not illusory. I mean, we don't even hear an allegation today. I think he acknowledged it's not illusory coverage. The coverage at issue covers many, many things, and there's no ambiguity in the managed care activities exclusion as to how to read it. This ambiguity argument as between the two, I don't know of any Kansas law that has adopted that. We are aware of that has adopted that ambiguity argument. There's plenty of things that would be covered by this insuring agreement, and the managed care activities exclusion is very clear, so we don't see where the ambiguity is. Well, I do.  The exclusion for managed care activities looks awfully broad to me. Alleging arising, any claim alleging arising out of, based upon, or attributable to, any actual or alleged act, error, or omission in the performance of, or failure to perform managed care activities. So if it's price fixing, that would seem to be something that arises out of your managed care activities, because that's when you're setting prices. On the other hand, and this is something else that just occurred to me, it looks like the managed care activity exclusion negates the whole policy. You can't do anything that isn't within that definition of managed care activities. But that's what I'm trying to explain, is this is a D and O policy, unlike the E and O policy, where this exclusion was not included, and coverage was provided under a reservation of rights by Allied World. In this policy, this exclusion was included, obviously negotiated. This- What do you mean by obviously negotiated? This exclusion was negotiated? Well, no, I mean, these were both, both policies were purchased at the same time for the same policy period. So there was an awareness, of course, that there's a difference between the two. I don't think there's even been a denial of that. But this D and O policy covers a whole host of activities that are outside the managed care, the operation of the actual managed care operation, all types of activities that would be at the corporate level of Blue Cross Blue Shield. Antitrust conspiracy allegations, for instance, to steal proprietary information. We did not acquiesce that a director stealing information would not qualify. That was an example that was given in the cases. And a conspiracy- So you're saying that would be covered against Blue Cross? I think what he would, I think what my colleague was indicating was a single isolated theft by a director where the company wasn't involved at all. But what I'm saying is a conspiracy where a director or numerous directors conspired with a competitor to steal information from one side or the other. I think Blue Cross could be sued. And that would, under an antitrust theory? Yes. Okay. And that's my point is that these general corporate activities are outside of the actual operation of the managed care activities. And that's where the DNO policy really focuses. And that's what sets it apart from the ENO policy. And so I would urge you to affirm on this basis. And of course, affirming on this basis pretty much is determinative of the case. So you wouldn't need to reach the other two. But we do have two other bases, alternative bases by the district court for this ruling, each of which are independent and sufficient. I want to talk about this related claims provision first as to how it applies because your honor was asking about my colleague's position as to how it applies. Related claims provisions apply both ways, forward-looking and backward-looking. And my colleague would have it apply just one way. One way that a related claims provision applies is to capture all claims that might arise after the policy period that are related to a claim first made in the policy period and pull those claims back into this policy period if the claim was first made in this policy period. And that is what the sentence at the end that he is referencing would apply to, is that pulling back of future claims under future policy periods. You're talking about the notice provision, the last sentence of the notice provision? Right, I'm talking about the limit of liability. It says in such event, only one limit of liability. That's what you're talking about? Yes, your honor. That's part of the notice of claim provision. Right. And that's if you have a claim that's first made in this policy period and then later down the road there are other claims, it would pull them back into this. But the other way related claims provisions work, and there's an abundant case law that we cite on this, is backward-looking, which is if a claim, a related claim has already been made earlier in a different policy period, all claims get pushed back to those prior to the first claim made. And that's what the district court judge decided here. But if it's that first claim, is that under the policy or is that 15 years ago somebody did something and now there's the same thing comes up later on with the policy, that's gone because of related claims? Correct. If it truly is related, but yes. Well, how is it, you know, how do you determine if it's related? In other words, I got the impression if it was the same title, that made it related if it was now 10 years later. The same title? Yeah, in other words, say the individual was charged with X 10 years ago, and now 10 years later the policy's in force and he's charged with a different count of X. No, Your Honor, it doesn't have to be the exact same claim. It has to be substantially similar factual circumstances. And if you, the district court judge did, I think, a remarkable job of laying out those similar circumstances with the Love litigation, because both the Love litigation, which is what is the related claim, and the current litigation all arise out with the same operations of the managed care. Not the same conduct, but the same instrumentalities like the Blue Court. Well, much of it is the same conduct, too. The way that they are arranged, the way that... So you're saying in the Dr. Jones litigation that there was a theory of liability that Blue Cross Blue Shield was committing price fixing through these ESAs? Right, well, through the same mechanism because of the way they have set up geographic, right, the geographic, the blue card. And that there were these horizontal limitations in the Dr. Jones litigation saying that one blue can't compete against another blue, and that that was the result of underpaying. Correct. And pages 42 to 44 of the district court's order goes through those comparisons in detail. It's not that they're the same cause of action. They're based on at least some common facts. Right, the same predicate, the same mechanism by way of... But it doesn't have to be the exact same cause of action. It doesn't have to be the same parties. But it does have to be the same conduct, doesn't it? It does have to be, at some level, the same conduct. Not every piece of the conduct has to be identical. Yeah, but if you had, let's say, they bill through the blue card system. Well, yeah, so 40 years from now, there is a completely different theory that Blue Cross Blue Shield of Kansas committed this illegality through the blue card system. You're going to say that had to have been made in 2003 because in 2003, there was a claim in the Dr. Love litigation that they used the blue card system. Or that in, let's say, 100 years, they were underpaying pharmacists through their manipulation of the blue card system. Different than the blue card, different than the Love litigation, different than the MDL. But all of that had to have been made under this Notice of Claim provision in 2003 because it used the same instrumentalities. If it's the same mechanical predicate that allows this to happen, then I don't think the passage, I mean, that's an extreme hypothetical, that many years on. But the passage of time is not the key element. It arises from the same substantially similar factual circumstances, and the judge identified what those are on pages 42 to 44, and I would say it's much more than the reply brief would indicate. Those are, oh, I'm sorry, I'm happy to answer any other questions. Let me ask you on that notice provision we talked about a little while ago. The initial litigation here was the Love litigation, is that what you're saying? Yes, Your Honor. So under that notice provision, as you understand it, if Blue Cross had been covered by an LLC and had an allied policy at that time, by policy with the same provision, then the present case would be a related case, and if there's any money left over after paying the attorney fees in the Love litigation, that could be used for the MDL case, is that right? In your hypothetical, I think that is how a related claim clause works in the forward looking way, so yes. But now we're using it backwards. We're saying it's related to the Love, and therefore... Right, but I'm saying from the Love policy's point of view. Yeah. From the Love policy, I'm sorry, from the Love policy's point of view, if it had had that same provision, it would pull related claims back into that. But in this case, there was no allied policy at the Love time, or do we know whether there was an allied policy? I hesitate to answer that question. I'm not sure exactly. I would like to end, though, because the reply brief says numerous times that we waived arguments and cites the Donahue case from this court, and obviously, as the appellee, this court is welcome to affirm on any basis, but we don't waive an argument by not having made it below in defense of... We do consider it under Elkins versus Comfort, don't we? What's that? In other words, if you didn't brief something in district court, and you brief it now, that's at least one of the factors that we take into account in whether to affirm an alternative grant. Oh, there is complete discretion in the court whether to affirm on alternative grounds. You have all kinds of, and that very well may be a factor, but it is not an absolute waiver barring plain error for an appellee to give an argument, not raise a new issue, but to give an argument in support of an issue that was well-preserved. And so I take issue with the citation of the Donahue case, which was focused on an appellant seeking reversal. We would urge the court to affirm primarily on the managed care activities, but in the alternative on any of the three grounds that are independent and sufficient to support this judgment. Thank you. I'm happy to answer any questions that the panel may have. Questions? I have a question about... Thank you, counsel. The case is submitted. Counselor excused.